FILED
2021 Aug-26  PM 01:19
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **ALABAMA SPACE SCIENCE EXHIBIT COMMISSION d/b/a U.S. SPACE & ROCKET CENTER,** | } } } } | |
| | } } } } | |
| **Plaintiff,** | } } } | |
| | } } | **Case No.: 5:14-cv-00413-MHH** |
| **v.** | } } | |
| | } | |
| **ODYSSEIA CO. LTD.,** | } | |
| | | |
| **Defendant.** | | |

### MEMORANDUM OPINION AND ORDER

This case is before the Court on the Alabama Space Science Exhibit Commission's motion for summary judgment.  (Doc. 89).[1]  The Alabama Space Science Exhibit Commission or ASSEC is the exclusive licensor of the Space Camp® trademark and related designs, processes, and materials.  Odysseia Co. Ltd.,

---

[1] In its motion, ASSEC asked for the fourth time that this Court remand this action to state court. (Doc. 89, p. 1).  In a separate memorandum opinion and order, the Court denied that request.  (Doc. 104).

a South Korean company, executed an "Offer to Enter into License Agreement" with ASSEC for a Space Camp® program in South Korea.  After Odysseia paid ASSEC $1.75 million, the fee ASSEC required for a Space Camp® license, ASSEC passed on a licensing agreement with Odysseia and began license negotiations with another company in South Korea.   ASSEC has not refunded Odysseia's $1.75 million payment.

In its complaint, ASSEC asks the Court to declare that its "Offer to Enter into License Agreement" with Odysseia expired and to enjoin Odysseia from claiming rights under the draft licensing agreement attached to the Offer document.  (Doc. 1-1, p. 5).   In its answer, Odysseia asserts state law counterclaims for breach of contract, unjust enrichment, promissory estoppel, and promissory fraud.  (Doc. 32, pp. 13–18).  ASSEC has asked the Court to enter judgment in its favor on Odysseia's counterclaims.   (Doc. 89).   This opinion resolves ASSEC's summary judgment motion.

The opinion is organized in three sections.   First, the Court outlines the standard for a Rule 56 motion for summary judgment.  Then, the Court discusses the evidence concerning the ASSEC-Odysseia relationship.  Finally, the Court identifies the legal standards that govern Odysseia's state law claims and examines the summary judgment evidence under those standards.

# I.

A district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  To demonstrate a genuine dispute as to a material fact, a party must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1)(A). "The court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3).

"A litigant's self-serving statements based on personal knowledge or observation can defeat summary judgment." *United States v. Stein*, 881 F.3d 853, 857 (11th Cir. 2018).  Even if a district court doubts the veracity of the evidence, the court cannot make credibility determinations. *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013) (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).  Conclusory statements in a declaration cannot by themselves create a genuine issue of material fact. *See Stein*, 881 F.3d at 857 (*citing Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

When considering a motion for summary judgment, a district court views the evidence in the record in the light most favorable to the non-moving party and draws reasonable inferences in the non-movant's favor. *Asalde v. First Class Parking Sys. LLC*, 898 F.3d 1136, 1138 (11th Cir. 2018). Accordingly, for ASSEC's summary judgment motion, the Court views the evidence in the light most favorable to Odysseia and draws all reasonable inferences in Odysseia's favor.

## II.

ASSEC owns and operates "Space Camp®" and licenses the program and related products internationally. (Doc. 1-1, p. 3, ¶¶ 6, 8). On March 20, 2006, Odysseia agreed in writing to pay ASSEC "a nonrefundable payment in the amount of U.S. $1,750,000 for a Space Camp® license . . . ." (Doc. 1-3, p. 2, ¶ 2). The writing consists of a four-page signed "Offer to Enter into License Agreement" which contains the license fee provision quoted in the previous sentence and a 24-page unsigned Draft License Agreement attached as an appendix to the Offer document. (Doc. 1-3, pp. 2–5; Doc. 1-3, pp. 6–29). The Draft License Agreement contains the following provision concerning a license fee:

> In consideration of the license granted herein, Licensee shall pay licensor a license fee of One Million Seven Hundred Fifty Thousand U.S. Dollars ($1,750,000) for SPACE CAMP® (9 – 12 years of age), SPACE ACADEMY® (12 – 14 years of age) and ADVANCED SPACE ACADEMY® (15 – 18 years of age) which shall be due in lawful currency of the United States, by wire transfer in immediately available funds on or before the date of this agreement.

4

(Doc. 1-3, p. 10, ¶ V(A)).

The Offer document established a timetable for Odysseia to pay the nonrefundable $1.75 million license fee in three installments.

> The first amount of $250,000 USD is due on or before March 30, 2006 (the "First Deposit"), the second amount of $500,000 is due on or before April 1, 2007 (the "Second Deposit")[, and] $1,000,000 (the "Final Payment") is due upon the signing of the License Agreement or July 2, 2007 (unless the Offer Termination Date is extended per paragraph 2), whichever occurs first and shall be payable in cash in lawful currency of the United States, by wire transfer in immediately available funds.

(Doc. 1-3, p. 3, ¶ 2).  The fee provision in the Offer document expressly links the nonrefundable $1.75 million consideration for ASSEC's offer to the fee provision in the Draft License Agreement.  The fee provision in the Offer states:

> Licensee hereby expressly acknowledges and agrees that under no circumstance shall Licensor be obligated to pay or return all or any part of the Payment to Licensee or any other person or entity, nor shall Licensee or any other person or entity have any claim against Licensor for or in respect of all or any part of the Payment; provided that if Licensee accepts Licensor's offer to enter into the Licensing Agreement on or before the Offer Termination Date, the First Deposit, Second Deposit, Final Payment, and any extension payments shall be applied to and constitute a credit against payment of the license fee set forth in Section V.A of the Licensing Agreement.

(Doc. 1-3, p. 3, ¶ 2).

The Offer contains an option for extending the "offer termination date" for up to one year.  The Offer states:

5

1. Licensor hereby offers to enter into the Licensing Agreement with Licensee at any time after March 20, 2006, but on or prior to August 1, 2007, unless extended per paragraph 2 (the "Offer Termination Date").

2. * * *

Prior to thirty days before the expiration of this agreement the Licensee may elect to extend the expiration date by a period of three months. Each extension requires an additional nonrefundable payment of $250,000 to be received by Licensor, which will reduce the Final Payment accordingly. There will be up to four extensions allowed for a maximum of twelve months extension and a maximum of an additional $1,000,000 paid. All payments will reduce the total nonrefundable amount of $1,750,000 by the amount of the payments thereby reducing the Final Payment accordingly.

(Doc. 1-3, pp. 2–3, ¶¶ 1, 2).  The four extensions were exercisable on or before July 1, 2007; October 1, 2007; January 1, 2008; and April 1, 2008.  (Doc. 1-3, p. 2).  If Odysseia exercised all four extensions, the Offer would expire on August 1, 2008. (Doc. 1-3, p. 2).

Regarding the expiration of the Offer, the agreement states:

9. [O]n August 1, 2007 at 1700 hours (CDT) (unless the Offer Termination Date is extended per paragraph 2), this Agreement will be deemed to expire and Licensor shall have no obligation whatsoever to Licensee or any other person or entity with respect to this Agreement, the Licensing Agreement or any of the matters contained herein or therein, and shall be free to contract with any other person with respect to such matters without any obligation or liability to Licensee or any other person or entity. This paragraph shall supersede any and all prior understandings of the parties, oral or written.

10. If the Licensing Agreement has not been entered into on or prior to the Offer Termination Date, then this Agreement shall be of no force or

effect and shall terminate on and as of such date, Licensor shall have no obligation or liability to Licensee or any other person or entity, including any proposed Licensee, with respect to the matters set forth herein or in the Licensing Agreement, and Licensee shall have no further obligation or liability to Licensor with respect to the matters set forth herein or in the License Agreement.

(Doc. 1-3, p. 4, ¶¶ 9–10).

The Offer obligated Odysseia "[p]rior to execution of the Licensing Agreement" to "promptly" give ASSEC information ASSEC requested "pertaining to the status of development of the facility to be licensed pursuant to the Licensing Agreement (the 'Facility'), and any other specified information such as, without limitation, investment information, ownership information, and financial information." (Doc. 1-3, p. 4, ¶ 4). The Offer indicates that the Offer Agreement "and the attachments hereto shall constitute the full and complete agreement" between the parties. (Doc. 1-3, p. 4, ¶ 5). The Offer states that it "may only be amended by a writing duly executed pursuant to all corporate or other authority by the parties hereto," (Doc. 1-3, p. 4, ¶ 6), and provides that the agreement must be interpreted and construed according to Alabama law, (Doc. 1-3, p. 5, ¶ 12). The Offer is signed by U.S. Space & Rocket Center CEO General Larry R. Capps and by Odysseia CEO Dr. Byung-Rok Song. (Doc. 1-3, p. 5).[2]

---

[2] ASSEC does business as the U.S. Space & Rocket Center. Many communications between the parties refer to ASSEC as USSRC. For purposes of this opinion, the names are interchangeable.

The "Draft Agreement Copy" of the "U.S. Space & Rocket Center® License Agreement" between ASSEC and Odysseia, for a "*date to be determined*," states that ASSEC, "within one hundred twenty (120) days of the final payment of the license fee," "shall make available" to Odysseia "prototype building design concepts of the training center, dormitory, cafeteria, and gift shop, including interior and exterior designs, signs, and such descriptions or specifications for equipment for the Facility" and "shall give" Odysseia "reasonable opportunities to question" ASSEC about those documents.  (Doc. 1-3, p. 6 (emphasis in Draft Agreement); Doc. 1-3, p. 11, ¶ VI.A).[3]  Likewise, the draft license agreement states that "within one hundred twenty (120) days of the final payment of the license fee," ASSEC "shall provide" to Odysseia a copy of the Space Camp® Manual.  (Doc. 1-3, p. 12, ¶ VI.G).[4]  The draft license agreement states that "[p]rior to the opening" of the Space Camp® facility in South Korea, ASSEC must provide Odysseia site evaluation assistance, review Odysseia's plans for the Space Camp® facility, and assist Odysseia with marketing and promotion of the Space Camp®.  (Doc. 1-3, p. 11, ¶ VI.B).

---

[3] Under the draft license agreement, "'Facility' means a planned educational center, in a Licensor-approved location, providing programs on space exploration, science and technology to Campers, which is modeled after the Space Camp® in Huntsville, Alabama, U.S.A. and is substantially based on the Space Camp® System, as defined herein."  (Doc. 1-3, p. 7, ¶ I.B).

[4] Under the draft license agreement, "'Manual' means the current version of Licensor's confidential operating manual as amended by Licensor from time to time."  (Doc. 1-3, p. 7, ¶ I.D).

Under the draft license agreement, during the term of the agreement, "except as otherwise provided," ASSEC could not "establish, directly or indirectly nor license another to establish, any part of the Space Camp Business" in South Korea "or elsewhere, without [Odysseia's] prior written consent." (Doc. 1-3, p. 8, ¶ II.C).

Each page of the draft license agreement contains the notation "Draft Agreement Copy" in the upper right-hand corner, (Doc. 1-3, pp. 6–29), and the notation "DRAFT AGREEMENT DO NOT SIGN" appears to the left of the signature lines for General Capps and Dr. Song on the final page of the draft license agreement, (Doc. 1-3, p. 29).

Notations on the fee provision in the Offer document in English and in Korean reflect dates on which Odysseia made payments toward the $1.75 million license fee. Odysseia made a $500,000 license fee payment on April 13, 2007. (Doc. 1-3, p. 3). Odysseia made another $250,000 payment at some point before June 4, 2007. (Doc. 1-3, p. 3; Doc. 1-5, p. 6).

On June 4, 2007, less than one month before the final $1 million license payment was due, Odysseia asked ASSEC to extend the Offer Termination Date per paragraph 2 of the Offer document. (Doc. 1-3, p. 3; Doc. 87-25, p. 2). In a letter to General Capps, Dr. Song stated:

> I will explain the reason for asking the extension after 2008. When I made the agreement, I expected the site would be settled by early 2007 and I could get funding from the Project Financing soon. But with the delay the Project Financing is likely hard to proceed.

9

* * *

As I told you before, after election on December the site will be fixed and once it is done, the financing would be no problem any more. Therefore I sincerely ask you to hold the payment after 2008. One thing obvious is I will manage to defray half to the amount($500,000) January 2008 and the others before July 1st 2008.

(Doc. 87-25, p. 2).

On June 28, 2007, ASSEC agreed to extend the Offer Termination Date.

(Doc. 1-5, p. 6).  In a letter to Dr. Song, General Capps wrote:

I received your request for [a] payment extension regarding the matter of the Offer to Enter into Licensing Agreement, dated March 20, 2006. The total due under this agreement is $1,750,000, $750,000 which has been paid, with a balance due of $1,000,000, all of which is nonrefundable, but will be applied to a license as agreed upon. You requested an extension of payments of the balance due to the following schedule:

<u>On or before July 31, 2007</u>          -     <u>$250,000</u>

<u>On or before September 14, 2007</u>     -     <u>$250,000</u>

<u>On or before June 30, 2008</u>          -     <u>$500,000</u>

I agree to the above requested schedule of payment change. This schedule takes precedent [*sic*] over the schedule in the Offer to Enter Licensing Agreement. This letter only amends the payment schedule of the aforementioned agreement. All other terms of the agreement remain in force.

(Doc. 1-5, p. 6).  On June 29, 2007, Dr. Song signed General Capps's letter,

indicating his acceptance of the payment schedule for Odysseia's final $1 million

obligation.  (Doc. 1-5, p. 6).

Odysseia made a payment of $250,000 on July 26, 2007; a payment of $250,000 on September 21, 2007; a payment of $150,000 on June 30, 2008; and a payment of $350,000 on July 31, 2008. (Doc. 1-3, p. 3; Doc. 1-5, p. 6; Doc. 88-22, pp. 14–15, tpp. 152–53). In a letter dated September 2, 2008, Mike Kelly, ASSEC's Vice President of Licensing, acknowledged that Odysseia had "completed the payment plan, in full, to purchase a Space Camp license." (Doc. 88-4, p. 17). Mr. Kelly stated that Odysseia's completed payment "completes the 'offer to Enter a License Agreement['] and opens the process for signing a final license agreement." (Doc. 88-4, p. 17). Mr. Kelly concluded: "Please inform me when you intend to sign the final license agreement. Congratulations on becoming the Space Camp licensee for Korea." (Doc. 88-4, p. 17).

Despite Mr. Kelly's acknowledgment that Odysseia had become the Space Camp licensee for South Korea, ASSEC did not sign a license agreement with Odysseia. (Doc. 88-22, p. 9, tp. 130). There is no evidence that ASSEC ever provided to Odysseia a final, dated license agreement for Odysseia's signature. Through Un Seop Song, a South Korean advisor who ASSEC retained to help identify a Space Camp licensee for Korea, ASSEC communicated to Dr. Song that it would not sign a license agreement with Odysseia until Odysseia "identified a location for the [Space Camp] acceptable to ASSEC and demonstrated the proof of

funds to start the Projects." (Doc. 96-1, p. 2, ¶ 6).[5]  Through Mr. Song, Dr. Song communicated to ASSEC that Odysseia needed the Space Camp Manual and an executed license agreement to obtain a location and funding. (Doc. 96-1, pp. 2–3, ¶¶ 6–7).  Mr. Kelly indicated that he "understood and [was] sympathetic, but he didnot [sic] have authority to provide these needed materials until [Odysseia] and [Dr.] Song satisfied ASSEC's demands." (Doc. 96-1, p. 3, ¶ 9).  After Odysseia completed its license fee payment in September of 2008, Mr. Song repeatedly told Mr. Kelly that Odysseia needed "a signed License, the Project Concept Materials, and the Manual" to move forward with site selection and financing for a Space Camp. (Doc. 96-1, p. 3, ¶ 7).  Mr. Kelly repeatedly refused to provide the materials before Odysseia had "provided an acceptable Project site location." (Doc. 96-1, p. 3, ¶ 7).

On June 9, 2010, ASSEC sent Odysseia a letter "to notify and confirm the expiration of the 'Offer' agreement dated March 20, 2006." (Doc. 88-4, p. 19). In the letter, Mr. Kelly stated that the Offer:

> expired August 1, 2008 (this is after one year extension as per agreement).  We have heard no request from you to extend or modify the agreement.   Per paragraphs 9 and 10 of the agreement, the agreement is deemed expired and we, the Licensor, have no obligation to you, the Licensee, or any other person or entity, including any proposed Licensee, with the [sic] respect to the matters set forth in the

---

[5] Mr. Song is not related to Dr. Song. (Doc. 96-1, p. 2, ¶ 2).  ASSEC retained Mr. Song in 2006 to help ASSEC identify a Space Camp® licensee for South Korea. (Doc. 96-1, p. 2, ¶ 1; Doc. 96-1, pp. 7–11).

Agreement, and [you], the Licensee shall have no further obligation or liability to Licensor with respect to the matters set for the [*sic*] in the Agreement.   This letter is being sent through Mr. Un Seop Song, attorney at law, Seoul, Korea.

(Doc. 88-4, p. 19).

Odysseia responded on June 18, 2010.   Dr. Song wrote that Odysseia was performing its duties, but ASSEC was not fulfilling its obligations.   (Doc. 88-4, pp. 20–22).   Dr. Song stated:

On September 2, 2008, you sent me a Letter stating that you have paid the License Fee according to paragraph 2 as regulated, fully performing to the schedule and opened the final License Agreement.

Thereafter, I have made huge efforts to search for various sites to establish Camps and review land use permission issues. I continuously informed Mr. Un Seop Song(Attorney), your agent, of such efforts and all each process. I also know that Mr. Song has kept you up to date with the notified information.

\* \* \*

[ASSEC] understood the situation when we have distinctly mentioned that it takes at least 2 years in securing sites and obtaining land use permission in case of Korea, at the time of forming a contract with us.

\* \* \*

After I received your letter on September 2, 2008, I suggested several times to your agent, Mr. Un Seop Song, about searching for sites after signing the "USSRC License Agreement" since it may take some time to find appropriate sites. However, Mr. Un Seop Song stated that "USSRC License Agreement" should be made after the site is finalized (there are no such articles in the contract) and that it is advisable to do so. I took Mr. Un Seop Song's opinion as yours (USSRS) [*sic*], making

steady efforts in order to finalize sites as soon as possible (Mr. Un Seop Song completely knows this matter as well.).

Due to such effort, our review showed that there are no approval issues for Camp establishment for a site that Gimpo-si, a very close satellite city, recently recommended. Therefore, we are proceeding executive preparation after agreeing to enter into an agreement with Gimpo-si about them providing the site before August 30, 2010. We are expecting to hold a signing ceremony of the "USSRC License Agreement" in Korea by inviting USSRC, as soon as the agreement is concluded (during September 2010).

I am very surprised and confused after receiving your letter, when I am proceeding with our work as I stated above.

\* \* \*

In addition, though it was not in a written document, I have communicated through USSRC's agent Mr. Un Seop Song several times to sign the "USSRC License Agreement.["] However, we were told that USSRC wanted to sign the Agreement after finalizing the site to establish Space Camp. Therefore, I would like to bring this to your attention that I have no legal responsibility whatsoever.

Moreover, USSRC is still not performing Licensor's duty regulated in VI. A and G in the "USSRC License Agreement" which is attached to the contract. Especially, despite the fact that we requested for a manual through Mr. Un Seop Song and he delivered such request, I would like to clarify that it is still not performed.

(Doc. 88-4, pp. 20–21).  Dr. Song quoted the license agreement provisions that required ASSEC to make available to Odysseia within 120 days of the full payment of the license fee the Space Manual and prototype design concepts.  (Doc. 88-4, pp. 21–22).  Dr. Song concluded:  "I officially request for a written signature in the 'USSRC License Agreement' which is attached to the contract between Odysseia

and USSRC." (Doc. 88-4, p. 22).  Dr. Song offered to travel to Huntsville to sign

the license agreement.  (Doc. 88-4, p. 22).[6]

In a July 1, 2010 email to Dr. Song, ASSEC reasserted its right to terminate

the Offer but indicated that it might reconsider its decision to terminate if Odysseia

produced a detailed plan for the Space Camp® project.  (Doc. 88-4, p. 23).  In the

email, Mr. Kelly wrote:

> I have received your letters and I am sympathetic to your situation.
> Even though we have the right to terminate the agreement as outlined
> in a previous letter to you, we are not without concern.  We will wait
> on issuing any new license for Korea pending your response.  We will
> require a detailed plan on how you propose to open a Space Camp
> Facility.  If this plan is acceptable to us and shows us that you can open
> and operate a facility then we may reconsider our decision to terminate
> the "Offer" agreement and sign a license agreement with you.  This new
> license agreement, if signed, shall contain certain milestones that you
> must reach in order to keep the license valid such as, time limits on
> acquiring land, purchasing equipment, and opening the facility.  If you
> wish to submit a plan to us then please respond with a yes or no to
> submitting a plan to us within 5 days and I will freeze any discussions
> in Korea with potential licensees.  If your response is yes then also
> include a date that the plan will be submitted to us for review.

(Doc. 88-4, p. 23).

Odysseia responded the same day.  (Doc. 88-4, p. 40).  Odysseia stated that it

was preparing to enter an agreement with a local government to select a project site

and was proceeding with investor discussions.  (Doc. 88-4, p. 40).  Dr. Song wrote:

---

[6] It appears that Dr. Song either sent or resent the June 18, 2010 letter to Mr. Kelly and General
Capps via email on June 20, 2010.  (Doc. 88-4, p. 23).

Gimpo-si, a local government, recommended a site for Camp to me. Camp shall be established in Gimpo-si, a satellite city near Seoul Metro city.  Our review showed that there are no approval issues for Camp establishment.  Therefore, we are proceeding executive preparation to enter into an agreement by the end of August 2010 with Gimpo-si about providing the site[.]

And also proceeding the discussion with partner who will invest on Space Camp.  I think it is not that hard to reach a conclusion with partner, because a site securing is almost done.

As I've already requested to sign a contract in the last letter, I will establish and operate the camp facilities in Korea.  A mayor of the Gimpo-si, elected by local election in the 2nd of June, holds a inauguration in the 1st of July.  Therefore, it seems difficult to discuss thoroughly about camp site with Gimpo-si.  But I have strong confidence to make an agreement about site providing by the end of August, because of continuous discussion proceeding.

As you requested, I will provide a detailed schedule about site securing, starting camp construction, purchasing camp equipment, time of start business, and also I will show you before 15th July, 2010 a specific milestone how to establish and operate the camp so that you can review my plan thoroughly.

(Doc. 88-4, p. 40).

In July 2010, Odysseia sent ASSEC a document labeled "Space Camp Korea Development Plan."  (Doc. 88-4, pp. 25–39).[7]  The timeline that Odysseia proposed began with a visit to Huntsville to the U.S. Space & Rocket Center in August 2010. Odysseia planned to invite ASSEC to attend an event in South Korea in November 2010 during which Odysseia would sign a contract for a site for the Space Camp.

---

[7] ASSEC's corporate representative does not deny that ASSEC received Odysseia's development plan around the July 2010 timeframe.  (Doc. 88-1, p. 31, tpp. 119–20).

(Doc. 88-4, p. 38).  Odysseia projected final approval of the Space Camp design and related investment agreements in January 2011 and groundbreaking in July of 2011. (Doc. 88-4, p. 39).  Odysseia projected that Space Camp Korea would begin operating in March of 2013 with an annual operating cost of $3.5 million.  (Doc. 88-4, pp. 35, 39).  Odysseia provided a few initial schematics of the camp facility.  (Doc. 88-4, pp. 41–44).  If ASSEC discussed Odysseia's development plan internally or with Dr. Song, Odysseia's corporate representative was not aware of the discussions. (Doc. 88-1, pp. 31–32).

In an October 12, 2010 email, Odysseia informed ASSEC of project developments and informed ASSEC that the project was stuck with "no further progress" because Dr. Song did not have a Space Camp Manual and could not share details about the project with potential investors.  (Doc. 88-5, p. 4).  Dr. Song asked ASSEC to provide a project manual and other information.  (Doc. 88-5, p. 4).  He wrote:

> The Camp project is ongoing process in the area of near Seoul Metro, Gimpo city recommended, and it's already mentioned in 'Space Camp Korea Project plan', submitted in 12 July 2010.  When completed the land provision agreement with Gimpo I have a plan the Final Licensing Agreement ceremony.  But there's no further progress, because I don't have the Camp program manual yet, I requested several times to you, for the camp project promotion.  (Investors want to know the specifics of experience programs composition and how to operate, but I don't explain detailed to let investors know without manual)[.]

I requested camp manual in the letter on 1 July 2010 and also requested several time through the your Attorney, Mr. Un Seop Song, but I've got only from Mr. Song "there is no comment and no response".

Furthermore, until now there's no reply and no comment about 'Space Camp Korea Project plan', submitted on 12 July 2010 from you.  And so, I require again to provide the Camp program manual. Also, I request the reply of USSRC about 'Space Camp Korea Project plan' and I need catalogues of purchased equipment contained pricing information.

(Doc. 88-5, p. 4).[8]

An internal ASSEC file containing details of the Odysseia licensing agreement bore a sticky note on which Mr. Kelly wrote "Korea – Paid in Full; Option Expired; Not Open; No Government Approval; Need License Agreement."  (Doc. 88-4, p. 18).

---

[8] In its summary judgment brief, ASSEC asserts as an undisputed fact that it did not hear from Odysseia between July 1, 2010 and July 2, 2012.  (Doc. 90, pp. 11–12, ¶¶ 41–43).  ASSEC does not account for the July 2010 project plan Odysseia sent ASSEC, for Odysseia's October 2010 email to ASSEC, for Dr. Song's communications with Mr. Song (ASSEC's agent in Korea), or for the fact that ASSEC did not respond to Odysseia's July 12, 2010 project plan or to Dr. Song's October 2010 email. (Doc. 88-4, pp. 25–39; Doc. 88-5, p. 4).



Dr. Deborah Barnhart, who replaced General Capps as ASSEC's CEO and Executive Director in December 2010, testified that in January 2011, Mr. Kelly brought this file and others related to licensing opportunities to her for review. Each folder had a sticky note describing the status of the relevant licensing agreement. (Doc. 88-17, pp. 17–18, 21–22, tpp. 64–65, 80–81). Dr. Barnhart testified that she "had no reason to ask questions about the development of Space Camp Korea because the option in this folder had expired." (Doc. 88-17, p. 24, tp. 89). Dr. Barnhart did not ask Mr. Kelly why his note indicated "paid in full" or "need license agreement." (Doc. 88-17, p. 24, tp. 90).

On July 2, 2012, Odysseia sent a letter to ASSEC describing the status of the Space Camp® project and noting concerns. Dr. Song explained he had made progress with the project's budget and site selection. (Doc. 88-5, pp. 38–40). Dr. Song indicated that the South Korean local government entity with which Odysseia hoped to work had questions for ASSEC and that he needed ASSEC's assistance in promoting the project with investors. (Doc. 88-5, pp. 38–40). Dr. Song wrote:

> First of all, though it's been a long time since we made a license contract of Space camp, I feel really sorry about that the Space Camp project in Korea has not been promoted well as planned.

> As I already mentioned in a former letter, I've done my utmost to promote the project. But I had two critical problems, due to the subprime mortgage crisis which was triggered by the bankruptcy of Lehman Brothers Holdings, Inc.

> * * *

20

Fortunately, by my effort in the last two years, my company's budget is getting better and Yong-in Metropolis, close to Seoul, agreed to provide the site and to promote the project together(including budget investment). . . .

Therefore the persons concerned in Yong-in Metropolis and I plan to visit the USSRC, bringing the written agreement of joint promotion, signed by Yong-in Metropolis and Odyseia [*sic*]. . . .

Meanwhile, before visiting USSRC, Yong-in Metropolis wants to make a phone call or to contact by E-mail with your operation manager. Then, the person concerned in Yong-In Metropolis will ask the reason why the project in Korea has been delayed and the entire operating conditions of USSRC Space Camp, etc.

\* \* \*

There were several urging requests of USSRC for promoting project, so I endured the burden of it and I feel really sorry about that.  So, in order to assure the concrete Investment plan, I eagerly did my best. Finally, a detailed investment plan was made and co-investors were secured. For successful promotion of Space Camp in Korea, the assist and support of USSRC as partnership are needed.

(Doc. 88-5, pp. 39–40).

On July 10, 2012, Wookjin Hyun, the manager of the Park and Recreation Department of Yong-In, a city in South Korea, sent an email to Jennifer Crozier, the Executive Director of the U.S. Space & Rocket Center Foundation, asking questions about Odysseia's Space Camp® project.  (Doc. 88-5, pp. 47–48; Doc. 88-1, p. 7, tp. 23).  Ms. Crozier responded by typing her replies into the original email.  (Doc. 88-5, pp. 47–48).  The email with Ms. Crozier's responses states:

This is Wookjin Hyun from the City of Youg-In [*sic*]. I'm am the manager of the Park and Recreation Department and I would like to ask you five questions. I want to double check some information with you.

* * *

2.  Is the payment for the license finished after the agreement(contract)?

**I'm not sure what this question means.  There would be on-going residual royalty payments if a Space Camp is operating in Korea.**

3. When is the license expiration date for the Odyssey [*sic*] (valid until when)?

**This would be part of the discussions/negotiations with Odyssey. The standard term for a license is 25 years with two additional 5 year optional extensions.**

4.  Is SPACE CAMP provided with equipment designs during the operational phase?  **It is best if equipment is purchased through us. The designs are proprietary.**

5. Did you guys issue a license to another company in Korea instead of Odyssey? **No.**

(Doc. 88-5, pp. 47–48).[9]

Minutes from a July 18, 2012 joint meeting of ASSEC's Business and Executive Committees state under the topic "Licensing":  "Initial Korea contract was terminated in June 2010; however, interest remains and the Center has been paid $1.75 million to date."  (Doc. 88-5, p. 45).

---

[9] Ms. Crozier's responses incorporated in the original email have been bolded for ease of reading. According to its website, the Foundation supports the U.S. Space & Rocket Center and the Space Camp® family of educational programs.   U.S. SPACE & ROCKET CENTER FOUNDATION, https://rocketcenterfoundation.org/ (last visited July 29, 2021).  Ms. Crozier served as ASSEC's corporate representative in discovery in this matter.

Though ASSEC had not issued a license to another party in South Korea in the summer of 2012, ASSEC was exploring its options. On July 26, 2012, Mr. Song notified Ms. Crozier that he had located a new company that he believed was a promising candidate for a Space Camp® licensee in South Korea. (Doc. 88-2, pp. 28–29). Between August of 2012 and December of 2012, ASSEC eliminated Odysseia from a comprehensive list of ASSEC contracts. In its August 2012 contract report, ASSEC indicated that the expiration date of Odysseia's Offer was "TBD" – to be determined. (Doc. 88-5, pp. 5, 15). By December 31, 2012, Odysseia had disappeared from ASSEC's contract list, (Doc. 88-5, pp. 22–38), and Mirinae Development Co., Ltd. had replaced Odysseia as ASSEC's potential licensee in South Korea, (Doc. 88-5, p. 31). In its December 31, 2012 contract report, ASSEC indicated that it had agreed to an "Option to Enter Licensing Agreement" with Mirinae on October 25, 2012. (Doc. 88-5, p. 31).

The Option itself is dated October 23, 2012. (Doc. 88-3, p. 30). The Option between Mirinae and ASSEC calls for a $150,000 nonrefundable option fee which "is 10% of the total License Fee of $1,500,000" and payable toward the full $1,500,000 license fee that was due at the signing of the license agreement. (Doc. 88-3, p. 31). Mirinae's Option with ASSEC obligated ASSEC to "fully cooperate" with government officials in South Korea who would be responsible for permitting a Space Camp facility in the country and obligated ASSEC to supply to Mirinae all

"information and documents" that Mirinae would need to obtain permits and approvals for the "Space Camp Business." (Doc. 88-3, p. 33). The Option states:

> 8. . . . Licensor and the Licensee further agree that during any period of exclusivity that Licensor shall fully cooperate with inquiries by governmental officials or on behalf of entities approving, permitting or regulating Licensee or the Facility, as defined in the Licensing Agreement. Provided Licensee has given permission to Licensor, Licensor shall respond to inquiries regarding Space Camp in South Korea otherwise Licensor shall respond to inquiries by stating that Licensee has the exclusive rights in the Territory, as defined in the Licensing Agreement.
>
> ***
>
> 12. Licensor agrees to provide Licensee the information and documents necessary for Licensee to apply for requisite permits and/or governmental approvals for the implementation of the Space Camp Business, as defined in the Licensing Agreement. The information shall include sample curriculum, recommendations on facility design, layout, equipment, U.S. standards from which curriculum is developed and other documents and/or information deemed necessary by the relevant regulatory authority, provided however the information shall not include any proprietary or confidential information. It being the intent of the Licensor and Licensee to cooperate in providing the required documentation to secure approval, permitting and authorization to open the Facility, as defined in the Licensing Agreement.

(Doc. 88-3, pp. 33, 34, ¶¶ 8, 12).

On November 8, 2013, ASSEC signed a licensing agreement with Mirinae. (Doc. 88-3, pp. 36–63; Doc. 88-3, p. 58 (date of contract)). ASSEC representatives visited Mirinae representatives in South Korea once before ASSEC representatives signed the option agreement with Mirinae in October of 2012 during a second visit

to South Korea.  (Doc. 88-1, pp. 42–43, tpp. 165–66).  ASSEC representatives traveled to South Korea at least three times in connection with the Mirinae project. (Doc. 88-17, p. 29, tp. 111).

In a November 26, 2013 letter to ASSEC, Dr. Song requested information about ASSEC's relationship with Mirinae and asserted that a licensing relationship between ASSEC and Mirinae would breach ASSEC's contract with Odysseia.  (Doc. 1-5, pp. 3–5).  Dr. Song asked ASSEC again to sign a license agreement with Odysseia.  (Doc. 1-5, pp. 3–5).  Dr. Song wrote:

> I am writing this letter to you in relation to the licensing agreement between USSRC and Odysseia for the license of Space Camp Korea.
>
> On November 4, 2013, there was the Korean press report for 'Space Camp Korea' tourist complex construction project to be set up in Chuncheon, Korea.  The press report stated that USSRC, Mirinae Development Co., Ltd., Gangwon Province, and Kyobo Securities Co., Ltd. signed the investment agreement on November 4 for the development of Space Camp in Chuncheon.
>
> As per the press report, USSRC also signed the MOU for the license of Space Camp Korea to be granted to Mirinae Development Co., Ltd. in October, 2012 (a press even reported that they made the license contract), and based on this MOU, said four parties signed the investment agreement for execution of 'Space Camp Korea'.
>
> As you are well aware, USSRC and Odysseia Co., Ltd. executed the offer to enter into licensing agreement for Space Camp Korea on March 20, 2006 to grant the exclusive right to Odysseia to enter into the Licensing Agreement in Korea, and Odysseia paid USD1,750,000 to USSRC on or before July 31, 2008 as the license fee specified in the offer(Attachment 1).  USSRC confirmed such payment and opening of the process for signing a final licensing agreement in its letter dated September 2, 2008 (Attachment 2).

Thereafter, USSRC proposed that it would be better for the parties to sign the final agreement after our selecting the site on which the camp would be located, and therefore, the execution of the final agreement was delayed while we have been searching for the proper site.

However, since we did not want the prolonged delay in execution of the agreement, I demanded that the final execution regardless of the site selection on June 18, 2010 (Attachment 3), but have not received any reply from USSRC. In the meantime, Odysseia has nearly completed the process by selecting and analysing several sites including those in Yongin city and Gangwha county and preparing the investment plan and etc. necessary for the construction and operation with a central government affiliated organization.

Odysseia Co., Ltd. met the said press report when we were about to notify you of the progress in the procedure for the signature of the final licensing agreement and discuss the signing schedule with USSRC.

Accordingly, we request that you confirm whether USSRC signed MOU or the final licensing agreement with Mirinae Development Co., Ltd. to the effect stated in the press report. If it is the case, i[t] constitutes the explicit breach of the contract made between Odysseia Co., Ltd. and USSRC. In addition, we require that you clarify in sufficient details how and why USSRC made the MOU with Mirinae Development Co., Ltd. without any discussion with Odysseia as the potential licensee. On the other hand, we once again request that USSRC sign the final licensing agreement as we demanded on June 18, 2010 since we have completed the procedures to establish and operate Space Camp in Korea. You may suggest the signing schedule and its formality.

Unless we receive your official response for the execution of the final licensing agreement until December 25, 2013[,] we will have to take all legal measures necessary to protect and enforce our rights and interest and seek the payment of damages which we may incur due to your breach of the contract.

We look forward to receiving your response in a timely manner.

(Doc. 1-5, pp. 3–5).

On December 20, 2013, ASSEC's lawyers told Odysseia that ASSEC had entered into a license agreement with Mirinae.  The lawyers asked Odysseia to stop alleging it had entered into a licensing agreement with ASSEC.  (Doc. 1-6, pp. 2–3).  The lawyers stated in part:

> If you do not take swift action to remove your claims, the Center may face monetary damage and we will seek all remedies from you.
>
> As you know, you entered into an option for a license agreement.  Your option began in March, 2006, and it was extended a number of times, but it was terminated on June 9, 2010, when you failed to meet the conditions within the time required . . . .
>
> The Center has negotiated a very important relationship with another Korean developer which desires to enter into a Space Camp® license agreement with the U.S. Space & Rocket Center.  However, your recent allegations are obstructing that relationship.  You have alleged that you were somehow led to believe that you could wait to enter into a license agreement until after you had identified property, made other investment arrangements, and completed other things required during the option period.  Your allegations are not reasonable or believable for several reasons.  First, you seem to rely on statements made by Mr. Un Seop Song, but he was not the agent of the Center, rather he was your agent.  It is our understanding that he made the initial contact to the Center on your behalf, and he thereafter acted on your behalf.  Second, the Option Agreement itself states in paragraph 6 that it can "only be amended by a writing duly executed pursuant to all corporate or other authority by the parties hereto."  As you know, there is no written amendment allowing you additional time into an uncertain future to make the arrangements that were required under the option agreement.

(Doc. 1-6, pp. 2–3).

On February 6, 2014, ASSEC sued Odysseia in the Circuit Court of Madison County, Alabama.  (Doc. 1-1, p. 8).  ASSEC sought to enjoin Odysseia "from claiming any right" under the Offer "to enter into a license agreement with ASSEC for Space Camp® program in South Korea . . . ."  (Doc. 1-1, p. 5).  ASSEC also requested an order declaring that Odysseia's Offer "expired prior to the execution of a final license agreement and that [Odysseia] does not have an option to enter into a license agreement . . . ."  (Doc. 1-1, p. 5).  Odysseia removed the case to federal court and, in its answer, asserted counterclaims against ASSEC for breach of contract, promissory fraud, unjust enrichment/quantum meruit, and promissory estoppel.  (Doc. 1; Doc. 32, pp. 13–18).

## III.

To evaluate Odysseia's state law claims, the Court begins with a fundamental question – what is the nature of the Offer document that ASSEC and Odysseia executed?[10]  Early on, the Court asked the parties whether the Offer instrument was an option contract or an agreement to agree.  (Doc. 56, pp. 17–22; Doc. 59).  The former is an enforceable agreement under Alabama law; the latter is not.  *Haddox v. Walker*, 522 So. 2d 266, 269 (Ala. 1988)).  Alabama case law suggests, and Odysseia

---

[10] *See McGuire v. Andre*, 65 So. 2d 185, 189 (Ala. 1953) ("[I]t is necessary for a disposition of this case to determine whether the contract which has been designated as Exhibit G is a contract of purchase and sale or an option.").

argues for, a third option:  the Offer may be a contract for a license.  (Doc. 97, p. 28).[11]

To answer the question, the Court must examine the Offer and the attached draft license agreement "to determine from an examination of the entire contract the intention of the parties under the terms of the contract."  *McGuire v. Andre*, 65 So. 2d 185, 189 (Ala. 1953).  The "nature of a contract is to be determined by the terms and conditions of the contract itself and not by the name given to it. It is not a question of what the parties call a contract, but what they put in the contract, because the law regards substance and not form."  *McGuire*, 65 So. 2d at 190.  "Whether a contract is ambiguous is a question of law for the trial court, *Mass Appraisal Services, Inc. v. Carmichael,* 404 So. 2d 666 (Ala.1981), and when a court determines that a contract is ambiguous, then ascertainment of its meaning is a question for the factfinder . . . . *Miles College, Inc. v. Oliver,* 382 So.

---

[11] Alabama law governs Odysseia's state-law claims.  The Offer document states that it "shall be interpreted and construed under the laws of the State of Alabama, U.S.A., which laws shall prevail in the event of any conflict of law, and under which all parties hereto submit for jurisdiction." (Doc. 1-3, p. 5, ¶ 12).

In cases like this in which a federal court exercises diversity jurisdiction, "a federal district court . . . must apply the choice of law rules of the forum state" in determining which law applies. *Clanton v. Inter.Net Global, L.L.C.*, 435 F.3d 1319, 1323 (11th Cir. 2006) (quoting *Trumpet Vine Invs., N.V. v. Union Capital Partners I, Inc.*, 92 F.3d 1110, 1115 (11th Cir. 1996)) (citation omitted).  Here, Alabama is the forum state, and in contract disputes, "Alabama courts 'first look to the contract to determine whether the parties have specified a particular sovereign's law to govern.'"  *Clanton*, 435 F.3d at 1323 (quoting *Stovall v. Universal Const. Co., Inc.*, 893 So. 2d 1090, 1102 (Ala. 2004)) (citation omitted).  Because the Offer includes a choice-of-law clause mandating that Alabama law will govern, the Court applies Alabama substantive law.

2d 510 (Ala. 1980)," *Franklin v. Jones*, 466 So. 2d 96, 98 (Ala. 1985).  An ambiguity may appear on the face of a contract, or an ambiguity may be latent such that it "is shown to exist for the first time by matter outside of the writing." *Carmichael*, 404 So. 2d at 672 (citations omitted).  In either instance, extrinsic evidence is admissible to clarify the ambiguity.  *Carmichael*, 404 So. 2d at 672.

An ordinary contract has four elements:  "an offer and an acceptance, consideration, and mutual assent to the essential terms of the agreement." *Stacey v. Peed*, 142 So. 3d 529, 531 (Ala. 2013) (quoting *Hargrove v. Tree of Life Christian Day Care Ctr.*, 699 So. 2d 1242, 1247 (Ala. 1997)).  An option contract has only two elements:  "the offer to sell which does not become a contract until accepted and, second, the completed contract to leave the offer open for a specified time." *McGuire*, 65 So. 2d at 189–90.  Option agreements often relate to real estate.  In that context, an option is:

> neither a sale nor an agreement to sell. It is simply a contract by which the owner of property agrees with another that he shall have the right to buy the property at a fixed price within a certain time. He does not sell his land; he does not then agree to sell it; but he does then sell something, viz.: the right or privilege to buy at the option or election of the other party. The second party gets *In praesenti* not lands, or an agreement that he shall have lands, but he does get something of value, that is the right to call for and receive lands if he elects. The owner parts with his right to sell his land, except to the other party for a limited period.

*Holk v. Snider*, 316 So. 2d 675, 677 (Ala. 1975).[12]  Stated differently, "an option merely gives the right to purchase within a limited time" for a fixed price "without imposing any obligation to purchase." *McGuire*, 65 So. 2d at 189.  The unilateral contract, "binding only upon the optioner and not the optionee . . . becomes a contract between the parties only when exercised or accepted according to its terms." *McGuire*, 65 So. 2d at 190.

Frequently, an option agreement is signed only by the offeror.  The mere execution of an instrument by both parties does not "make[] the instrument a bilateral contract, but it is certainly an indication that both parties intended to be bound by the terms and conditions of the instrument." *McGuire*, 65 So. 2d at 190 (citing *Gutierrez del Arroyo v. Graham*, 227 U.S. 181 (1913) for the proposition that an agreement for the sale of property appeared to be a contract rather than an option because the instrument was signed by both parties).[13]

The fact that an offer instrument does not bind the offeree to pay the full contract price "undoubtedly creates a difficulty," but "the fact that the contract does not formally bind the party to make payment[] is not regarded as conclusive of its

----

[12] "*In praesenti*" means "at present" or "right now."  *In Praesenti*, BLACK'S LAW DICTIONARY (11th ed. 2019).

[13] In *Graham*, the United States Supreme Court, in holding that the instrument at issue was a contract rather than an option, relied not only on the fact that both parties signed the instrument but also on the fact that the instrument imposed obligations on both parties and was "not merely a promise by the [offeror]." *Graham*, 227 U.S. at 183.

character." *McGuire*, 65 So. 2d at 190.  "In other words there need be no express agreement that the purchaser has agreed to buy, but where it appears from the contract that the intent was to consummate a sale, the absence of an express agreement to purchase does not limit the contract merely to one of option, but it will be held to be a contract of purchase and sale." *McGuire*, 65 So. 2d at 190.

"An option must be supported by some consideration to render it more than an offer revocable before acceptance. The amount of the consideration is generally immaterial, but if an option is not supported by consideration, the offer is a mere gratuity which may be withdrawn at any time before acceptance." *Crowley v. Bass*, 445 So. 2d 902, 903 (Ala. 1984).  Ordinarily, the consideration for an option agreement is not the full contract price.  *McGuire*, 65 So. 2d at 190; *Bethea v. McCullough*, 70 So. 680, 683 (Ala. 1915).  But an optionor may require tender of the contract price as a condition of acceptance of an option.  *McMillan, Ltd. v. Warrior Drilling & Eng'g Co.*, 512 So. 2d 14, 23 (Ala. 1986) (discussing a stock purchase option).

Ordinarily, "'the contemplated mode of acceptance by an option holder is the giving of a notice [within the stated period] resulting in a bilateral contract.'" *McMillan*, 512 So. 2d at 22 (quoting 1A *Corbin on Contracts*, "Option Contracts," § 264, at 518 (1950)).  "Any restrictions or conditions on the mode of acceptance, must, therefore, be expressly stated by the optionor in the option contract."

*McMillan*, 512 So. 2d at 22.  An optionor "may require that notice of acceptance be given in writing (*Smith v. Cleveland,* 289 Ala. 401, 268 So. 2d 14 (1972)), or that the option be exercised by paying the purchase price within the stated time (*Nashville Trust Co. v. Cleage,* 246 Ala. 513, 21 So. 2d 441 (1945))."  *McMillan*, 512 So. 2d at 22.  "[T]he acceptance of an option must be substantially as required by its terms and all conditions complied with."  *McMillan*, 512 So. 2d at 22 (quoting *Madison Limestone Co. v. McDonald*, 87 So. 2d 539, 544 (Ala. 1956)).  Absent a provision in an option contract dictating "'the manner by which an option can be exercised, it is the general rule that any manifestation, either oral or written, indicating an acceptance on the part of the optionee is sufficient.'"  *McMillan*, 512 So. 2d at 22 (quoting *Duprey v. Donahoe*, 323 P.2d 903, 905 (Wash. 1958), in turn citing 55 Am. Jur. 507, § 38; 1 Corbin on Contracts 872, § 264).

Frequently, after an offeree provides notice of acceptance of an option, the parties, as part of their mutual obligations upon acceptance, must finalize various instruments to complete the transaction.  *McMillan*, 512 So. 2d at 23 (quoting *Duprey*, 323 P.2d at 906).  For example, when a party exercises an option for the purchase of real property, to complete the sale, the parties must execute documents conveying title to the property.  When the date for completion of all steps required to finalize the underlying contract – here a license agreement – "'*is not definitely fixed in the [option] contract, a reasonable time after acceptance [of the option]*

*must be allowed to perform*'" the underlying contract. *McMillan*, 512 So. 2d at 23 (quoting *Duprey*, 323 P.2d at 906) (italics added in *McMillan*).   When an option agreement is silent as to the method of conveyance, "usage or custom becomes a part of the contract," and "the 'manner of performance as well as the terms of performance of a contract may be implied from the facts.'"   *Brown v. Butts*, 214 So. 3d 1181, 1188 (Ala. Civ. App. 2016) (quoting first *Green Tree Fin. Corp. of Ala. v. Wampler*, 749 So. 2d 409, 415 (Ala. 1999), and then *Watts Homes, Inc. v. Alonzo*, 452 So. 2d 1331, 1332 (Ala. Civ. App. 1984)).[14]

"The existence *vel non* of a contract is determined by reference to the reasonable meaning of the parties' external and objective manifestations of mutual assent."  *Deeco, Inc. v. 3-M Co.*, 435 So. 2d 1260, 1262 (Ala. 1983).  "Conduct of one party from which the other may reasonably draw the **inference** of assent to an agreement is effective as acceptance."  *Deeco*, 435 So. 2d at 1262 (citing *Mayo v. Andress*, 373 So. 2d 620, 624 (Ala. 1979)).   By way of example, the Alabama Supreme Court has explained that where a draft agreement expressly provides that it must be signed to become effective but the offeror writes letters to the offeree acknowledging the contract, the offeror's conduct raises a question of fact as to the existence of a contract, despite the fact that the formal agreement between the parties

---

[14] No option agreement exists when the parties merely indicate their intent to "agree on the terms of an option" at a later date.  *Haddox*, 522 So. 2d at 269.

is not fully executed.  *Deeco*, 435 So. 2d at 1262 (citing *Empire Machinery Co. v. Litton Business Telephone Systems*, 566 P.2d 1044, 1050 (Ariz. 1977)).

Applying these principles, the Offer document bears several characteristics of a contract.  The Offer is like a contract in that both ASSEC and Odysseia signed the Offer; Odysseia had to pay the full license fee as consideration for the Offer; and Odysseia had an obligation to perform under the Offer in that, until the parties signed the license agreement, Odysseia had to "promptly" respond to requests from ASSEC regarding "the status of the development of the facility to be licensed" as well as "investment information, ownership information, and financial information."  (Doc. 1-3, p. 4, ¶ 4).

But the Offer also contains language associated with option agreements.  For example, the Offer contains an introductory "WHEREAS" clause that provides: "WHEREAS, Licensee has requested Licensor to leave its offer to enter into the License Agreement with Licensee open until . . . August 1, 2017 (unless extended per paragraph 2)."  (Doc. 1-3, p. 2).  The Offer also states:  "During the period of effectively [*sic*] of this agreement the Licensor agrees to negotiate exclusively with the Licensee to enter into a license agreement for the territory of South Korea." (Doc. 1-3, p. 4, ¶ 9).[15]  And language in the Offer suggests that the parties anticipated

---

[15] The Offer permits Odysseia to extend by up to one year the Offer Termination Date.  The Offer's language concerning consideration for the potential one-year extension of the Offer Termination Date is baffling in English.  The Court does not know how this language translated to Korean.

negotiating some of the details of the formal license agreement after Odysseia accepted the Offer.  The Offer states:  "Licensor has offered to enter into a licensing agreement in substantially the form attached hereto as 'Exhibit A' (such agreement, with such additions, deletions, completions or changes thereto upon which Licensor and Licensee may mutually agree, being hereafter referred to as the 'Licensing Agreement') . . . ."  (Doc. 1-3, p. 2).

Still, the Offer states that it and the attachments to it – meaning the draft license agreement – "shall constitute the full and complete agreement between Licensor and Licensee with respect to the subject matter hereof. . . ."  (Doc. 1-3, p. 4, ¶ 5).  The Offer also states:  "In consideration of Licensor's offer, Licensee agrees to pay Licensor a nonrefundable payment in the amount of U.S. $1,750,000 *for a Space Camp® license . . .*,"  (Doc. 1-3, p. 2, ¶ 2) (emphasis added), not for the option

---

(Doc. 88-18, pp. 18–20, tpp. 68–69, 71–72, 74–75) (Dr. Song testified that the ASSEC-Odysseia negotiation was the first time he dealt with companies in English, and Mr. Song, ASSEC's agent, gave Dr. Song the Offer and Draft Licensing Agreement and explained the terms of the documents to him).  In English, the Offer provides that, to extend the Offer Termination Date, before July 2, 2007, Odysseia had to elect up to four three-month extensions of the Offer Termination Date and make "an additional nonrefundable payment of $250,000" for each extension for "a maximum of an additional $1,000,000 paid," but each $250,000 extension payment would "reduce the Final Payment [of $1,000,000] accordingly."  (Doc. 1-3, p. 3, ¶ 2).  By definition, the "Final Payment" was the final $1,000,000 due for the Offer consideration.  (Doc. 1-2, p. 2, ¶ 2).  The final sentence of the paragraph concerning the method for extending the Offer Termination Date states:  "All payments will reduce the total nonrefundable amount of $1,750,000 by the amount of payments thereby reducing the Final Payment accordingly."  (Doc. 1-3, p. 3, ¶ 2).  That language is virtually indecipherable, but reading the language against ASSEC, the party that drafted the provision, the sentence indicates again that each $250,000 extension payment applies to the $1.75 million license fee and reduces the $1 million Final Payment.  *Haddox*, 522 So. 2d at 269 (stating that ambiguities "are to be construed against the drafter.").

for a Space Camp® license.  And the license fee provision in the draft license agreement states that ASSEC must receive the entire $1.75 million license fee on or before the effective date of the license agreement.  (Doc. 1-3, p. 10, ¶ V(A)).  Viewing the evidence in the light most favorable to Odysseia, full payment of the license fee was acceptance of ASSEC's offer of a Space Camp® license.

To further confuse matters, full payment of the license fee triggered several obligations for ASSEC under the draft license agreement.  For example, the draft license agreement provides that ASSEC, "within one hundred twenty (120) days of the final payment of the license fee," "shall make available" to Odysseia "prototype building design concepts of the training center, dormitory, cafeteria, and gift shop, including interior and exterior designs, signs, and such descriptions or specifications for equipment for the Facility" and "shall give" Odysseia "reasonable opportunities to question" ASSEC about those documents.  (Doc. 1-3, p. 11, ¶ VI.A; *see also* Doc. 1-3, p. 12, ¶ VI.G).  ASSEC's obligation is tethered to payment of the $1.75 million license fee, not the execution of the draft license agreement.

Having examined the entire Offer document and the attached draft license agreement, the Court finds that the Offer is ambiguous, and "there remain genuine issues of material fact as to the true intentions of the parties to the contract at issue." *J.I.T. Services, Inc. v. Temic Telefunken-RF, Eng'g, L.L.C.*, 903 So. 2d 852, 858 (Ala. Civ. App. 2004).  A factfinder must sort through the evidence and determine

whether the Offer is an option contract or an ordinary contract for a license agreement. In weighing the evidence to make this determination, jurors will be able to consider extrinsic evidence such as the September 2, 2008 letter in which Mike Kelly, ASSEC's Vice President of Licensing, congratulated Dr. Song "on becoming the Space Camp licensee for Korea." (Doc. 88-4, p. 17). Jurors also will be able to consider ASSEC's efforts to enlist Mirinae as a Space Camp licensee in South Korea. Unlike the "Offer to Enter into Licensing Agreement" that ASSEC signed with Odysseia, ASSEC entered an "Option to Enter Licensing Agreement" with Mirinae. (Doc. 88-5, p. 31). The Option instrument between ASSEC and Mirinae states: "In consideration of Licensor's offer, Licensee agrees to pay Licensor a nonrefundable option fee ('Option Fee') in the amount of $150,000 USD for a Space Camp® License. The option fee payment of $150,000 USD is due within 7 business days upon signing the Option Agreement . . . The Option Fee is 10% of the total License Fee of $1,500,000 ('Total License Fee')." (Doc. 88-3, p. 31, ¶ 2). Mirinae's Option required payment of the total $1.5 million license fee "upon signing of the Licensing Agreement." (Doc. 88-3, p. 31, ¶ 2).[16]

---

[16] There are several other significant differences between the Mirinae Option and the Odysseia Offer that the Court does not have to reach here to decide that the Odysseia Offer is ambiguous.

***Breach of Contract***

Odysseia contends that ASSEC breached the Offer in several ways:  ASSEC "refus[ed] to move forward and execute the formal license agreement with Odysseia;" ASSEC "fail[ed] to provide the prototype building design concepts and the Manual in English;" and ASSEC "breached its exclusivity obligations . . . by engaging with another Korean developer regarding the development of Space Camp® Korea."  (Doc. 32, pp. 13–14, ¶¶ 28–30).  Odysseia alleges that these breaches "prevented [it] from developing the Space Camp® program (and related programs) in South Korea—after having spent millions of dollars on the process."  (Doc. 32, p. 14, ¶ 31).

ASSEC contends that the Offer expired because Odysseia did not sign the license agreement before the Offer Termination Date, relieving ASSEC of its obligations under the Offer.  (Doc. 90, p. 28; Doc. 98, p. 10).  ASSEC argues:  "The Option provided that, if Odysseia did not accept ASSEC's offer by executing a licensing agreement before the Option's expiration date, ASSEC would retain the $1,750,000, and the parties would have no future obligation."  (Doc. 90, p. 25).  ASSEC acknowledges that it provided only a draft license agreement to Odysseia but contends that it had no obligation to provide a final license agreement for Odysseia to sign before the Offer Termination Date because "Odysseia could not provide site or financing information before the Option termination date . . . ." (Doc.

90, p. 29).  ASSEC concludes:  "Because no license agreement was signed by the Option termination date of August 1, 2008, ASSEC had no obligations to Odysseia after that point."  (Doc. 90, p. 28).

Not counting the fact that the Offer agreement is ambiguous, several disputed questions of fact stand in the way of ASSEC's summary judgment arguments.  First, as noted, under Alabama law, even though the language of the Offer and draft license agreement required the parties' signatures, the parties could indicate their mutual assent to the license agreement through their conduct.  *Deeco*, 435 So. 2d at 1262. Jurors could find that Odysseia manifested its intent to accept ASSEC's Space Camp® license offer by paying the $1.75 million Space Camp® license fee, and ASSEC manifested its intent to issue a Space Camp license by accepting the $1.75 million fee.  That finding of fact would rest comfortably on the September 2, 2008 letter in which Mike Kelly, ASSEC's Vice President of Licensing, wrote to Dr. Song:

> This letter is to recognize that you have completed the payment plan, in full to purchase a Space Camp license. This requirement completes the "Offer to Enter a License Agreement["] and opens the process for signing a final license agreement. Please inform me when you intend to sign the final license agreement. Congratulations on becoming the Space Camp licensee for Korea.

(Doc. 88-4, p. 17).[17]

---

[17] ASSEC argues that Odysseia did not tender its "final Option fee payment to ASSEC" until July 31, 2008, "in breach of the June 30, 2008 deadline" for the final payment.  The record indicates

Additionally, as noted, under Alabama law, absent a contractual deadline for the parties to execute a final license agreement, the parties had a reasonable time after Odysseia accepted ASSEC's Offer to finalize the license agreement. *McMillan*, 512 So. 2d at 23. Where, as here, the drafter of the final agreement erects hurdles to execution of the agreement, the optionee or offeree is excused from timely fulfilling its obligation to finalize the contract documents. *Ex parte Keelboat Concepts, Inc.*, 938 So. 2d 922, 926 (Ala. 2005) ("This Court has [] held that an optionee is excused from timely performance under an option contract when the optionee's failure to exercise the option within the time required by the contract was a direct result of the optionor's conduct."); *Jackson v. L.D. McReynolds, Inc.*, 430 So. 2d 873, 876 (Ala. 1983) (a lessee did not fail to exercise his option to purchase

---

that ASSEC accepted all of Odysseia's payments, and Odysseia made almost all of its payments past payment due dates. (Doc. 1-3, p. 3). Under Alabama law, an optionor may waive conditions involving an optionee's performance under an option contract. *See Ex parte Keelboat Concepts, Inc.*, 938 So. 2d 922, 925 (Ala. 2005) ("[T]his Court has recognized certain factual situations in which the optionee may be excused from timely performance in exercising the option under an option contract."); *Murphy v. Schuster Springs Lumber Co.*, 111 So. 427, 430 (Ala. 1926) ("But the principle of waiver goes further than this; and, with respect to the timeliness of the tender, if no objection is made on that ground, but only on some other, the default as to time is held to be waived."). Likewise, an offeror who controls the manner of acceptance of an offer may, through its conduct, waive the written requirements for the mode of acceptance of the offer. *Deeco*, 435 So. 2d at 1261-62; *see Ex parte Spencer*, 111 So. 3d 713, 718 (Ala. 2012) ("The question of waiver, the voluntary surrender of a known right, is in the main a question of intention, and the authorities hold that, to be effectual, it must be manifested in some unequivocal manner; if not express, then by such language or conduct as to evince clearly the intention to surrender.") (citing *Bennecke v. Connecticut Mut. Life Ins. Co.*, 105 U.S. 355 (1881); *Balfour v. Parkinson*, 84 Fed. 855, 861 (C.C.D. Wash. 1898), *aff'd sub nom. Balfour v. Hopkins*, 93 F. 564 (9th Cir. 1899)). Mr. Kelly's September 2, 2008 letter is compelling evidence that ASSEC waived the installment payment deadlines for Odysseia's license fee payments and the Offer Termination Date of August 1, 2008 (as extended by the parties pursuant to paragraph 2 of the Offer). (Doc. 1-3, pp. 2–3).

property on time because the "reason for [the lessee's] failure to make the necessary tender within the prescribed time rest[ed] with the [lessor] and not upon himself."). The evidence, viewed in the light most favorable to Odysseia, indicates that ASSEC created prerequisites to the execution of a final license agreement that did not appear in the Offer.  For example, as Dr. Song reminded ASSEC, the Offer did not require Odysseia to secure a site for Space Camp Korea before signing a license agreement, (Doc. 88-4, p. 21), but ASSEC refused to send Odysseia a final license agreement until Odysseia secured a site, (Doc. 96-1, p. 2, ¶ 6).

ASSEC contends that it did not have to provide a license agreement to Odysseia for signature because the Offer states:

> 4.   Prior to execution of the Licensing Agreement, Licensee shall promptly and from time to time supply Licensor with all information requested by Licensor pertaining to the status of development of the facility to be licensed pursuant to the Licensing Agreement (the "Facility"), and any other specified information such as, without limitation, investment information, ownership information, and financial information.

(Doc. 1-3, p. 4, ¶ 4).  True, this provision enabled ASSEC to request documents from Odysseia before the parties signed a license agreement, but the provision does not say that ASSEC could withhold a license agreement once Odysseia accepted ASSEC's offer, even if Odysseia had not produced every document that ASSEC requested.

Jurors reasonably could conclude that ASSEC created a Catch-22 for Odysseia by using paragraph 4 as an excuse for withholding a final license agreement. The draft license agreement contemplates that a Space Camp® facility modeled after the facility in Huntsville, Alabama would be opened within three years of the execution of a license agreement "subject, however, to Licensor's fulfillment of its duties" under the parties' license agreement. (Doc. 1-3, p. 7, ¶ I.B (defining "Facility"); Doc. 1-3, p. 9, ¶ IV). ASSEC's duties under the draft license agreement included providing Odysseia "reasonable assistance relating to . . . [m]arketing and promotion." (Doc. 1-3, p. 11, ¶ VI.B(3)). Dr. Song repeatedly explained that he needed a copy of a signed license agreement to prove to investors and others with whom he was negotiating for property for a Space Camp® facility that Odysseia was the Space Camp licensee for South Korea. (*See* Doc. 96-1, pp. 2–3, ¶¶ 6–8). ASSEC also was required to give Odysseia certain documents, including prototype building design concepts and a "Copy of the Manual in English" within 120 days of Odysseia's final payment of the license fee on July 30, 2008. (Doc. 1-3, pp. 11–12, ¶¶ VI.A, VI.G). Odysseia could not engage in productive negotiations for a facility site without these materials. Jurors could find that, by insisting that Odysseia provide site information before it would sign a license agreement, ASSEC erected insurmountable hurdles to the execution of a license agreement, excusing Odysseia's failure to sign an agreement. *Jackson*, 430 So. 2d at 876.

43

The evidence demonstrates that finalizing a license agreement was a simple task.  Mirinae and ASSEC simply made a few handwritten edits to the draft license agreement attached to Mirinae's Option, initialed each page, and signed the draft agreement.  (Doc. 88-3, pp. 36-63).  ASSEC, the drafter of the license agreement forms, did not even revise the "*date to be determined*" language in the Mirinae license agreement, (Doc. 88-3, p. 36) (italics in license agreement), or provide a signature line for Col. Lewis, (Doc. 88-3, p. 58).  Jurors could conclude that even if the parties opted to make formal revisions to the draft license agreement attached to Odysseia's Offer, ASSEC was the party most capable of revising the draft agreement to remove the "draft" language and provide Odysseia a clean agreement ready for signature.  ASSEC did not begin a conversation with Odysseia about potential revisions to the draft license agreement because ASSEC insisted upon new conditions for a formal license agreement after Odysseia paid the $1.75 license fee.

Thus, questions of fact preclude summary judgment on Odysseia's claim that ASSEC breached the Offer by "refusing to move forward with and execute the formal license agreement with Odysseia regarding the development of the Space Camp® program (and related programs) in South Korea pursuant to the parties' [Offer] agreement."  (Doc. 32, p. 13, ¶ 28).  Therefore, the Court denies ASSEC's motion for summary judgment on Odysseia's breach of contract claim.[18]

---

[18] ASSEC argues that Odysseia cannot prove it was damaged by the absence of a signed license

*Promissory Fraud*

Under Alabama law, to prove its promissory fraud claim, Odysseia must show that it reasonably relied on a false representation of material fact that ASSEC made and that ASSEC knew when it made the representation that it did not intend to perform the promised act. *See Target Media Partners Operating Co., LLC v. Specialty Mktg. Corp.*, 177 So. 3d 843, 866–67 (Ala. 2013). With respect to the intent element, the Alabama Supreme Court has explained:

> "[F]ailure to perform alone is not sufficient evidence to show a present intent not to perform. If it were, then every breach of contract would be 'tantamount to fraud.'" *Gadsden Paper & Supply Co. v. Washburn,* 554 So. 2d 983, 987 (Ala. 1989) (citing and quoting *Purcell Co. v. Spriggs Enters., Inc.,* 431 So. 2d 515, 519 (Ala. 1983)). Rather, there must be some evidence that would indicate a present intent not to perform, even if that evidence is only circumstantial. See *Byrd v. Lamar,* 846 So. 2d 334, 347 (Ala. 2002) ("Circumstantial evidence is appropriate proof of a present intent not to perform in a promissory-fraud case."), and *Harrison v. Gibson,* 534 So. 2d 257, 259 (Ala. 1988) ("Intent to deceive and intent not to perform at the time a promise is made can seldom be proven directly . . . .").

*Heisz v. Galt Indus.*, 93 So. 3d 918, 925–26 (Ala. 2012) (brackets in original). The Alabama Supreme Court also has explained that:

> Evidence of consistent, but unfulfilled, promises can in some cases amount to substantial evidence of an intent to deceive. *Goodyear Tire* [*& Rubber Co. v. Washington*], 719 So. 2d [774,] 777 [(Ala. 1998)]; *Campbell v. Naman's Catering, Inc.*, 842 So. 2d 654, 659 (Ala. 2002).

---

agreement. ASSEC also argues Odysseia should have mitigated damages by stopping work on the Space Camp project because Odysseia should have been aware that the License Offer expired. (Doc. 90, p. 28 n.18). Jurors must determine what period of time was reasonable for ASSEC to provide and the parties to sign a final license agreement. Odysseia may recover damages for losses it incurred in that time period.

> Additionally, "[a] defendant's intent to deceive can be established through circumstantial evidence that relates to events that occurred after the alleged misrepresentations were made." *Byrd v. Lamar*, 846 So. 2d 334, 343 (Ala. 2002).

*Southland Bank v. A & A Drywall Supply Co., Inc.*, 21 So. 3d 1196, 1212 (Ala. 2008) (last bracket in original).   "Although circumstantial evidence may be used to prove fraudulent intent, it must be of such quality that 'the jury, as reasonable persons, may fairly and reasonably infer the ultimate fact to be proved.'"   *Pinyan v. Cmty. Bank*, 644 So. 2d 919, 924 (Ala. 1994) (quoting *Marshall Durbin Farms, Inc. v. Landers*, 470 So. 2d 1098, 1101 (Ala. 1985)).

Odysseia contends that ASSEC fraudulently promised that it would "execute and honor the formal license agreement granting to Odysseia the exclusive, licensed right to develop the [*sic*] Space Camp Korea (and related programs) upon Odysseia's payment of the $1.75 million in licensing fees;" that it would "provide the [] written assurances that were required by Odysseia for moving the project forward (such as the prototype building design concepts and 'Manual in English') to Odysseia in a timely manner;" and that Odysseia had become "the Space Camp licensee in Korea." (Doc. 32, p. 17, ¶¶ 45–47).   Odysseia alleges that ASSEC "had an undisclosed practice and view that its obligations to foreign licensees were subject to change without notice, approval, or agreement by the counter-party to the contract."  (Doc. 32, p. 18, ¶ 52).

To survive ASSEC's summary judgment motion, Odysseia must point to circumstantial evidence that shows that when ASSEC signed the Offer in March of 2006, ASSEC did not intend to enter a license agreement with Odysseia for a Space Camp® program in South Korea. Evidence relating to the Space Camp manual bears on ASSEC's intent. The evidence, viewed in the light most favorable to Odysseia, shows that the only Space Camp® manual that ASSEC could offer licensees as of 2010 was "very outdated" – so much so that it was prepared with a typewriter. (Doc. 88-1, pp. 29–31, tpp. 112–17). The manual contained some information that was "still valid and appropriate and accurate as far as how to run a Space Camp," but other information in the manual would have to have been updated if Odysseia were to use it. (Doc. 88-1, pp. 30–31, tpp. 115–17). ASSEC had so few licensees that it had not updated its manual since at least the 1990s. (Doc. 88-1, pp. 29–30, tpp. 112, 114). Because Odysseia could have paid the entire $1.75 million license fee any time after the parties signed the Offer on March 20, 2006, ASSEC should have had an updated manual ready or close to ready when it signed the Offer, but it did not. That is compelling evidence that in 2006, ASSEC did not intend to finalize a license agreement with Odysseia.

The contrast between Odysseia's Offer from ASSEC and Mirinae's Option agreement with ASSEC also sheds light on ASSEC's intent when it signed the Offer with Odysseia. Under the Offer and the attached draft license agreement, ASSEC's

obligation to provide Space Camp information and marketing support to Odysseia appears only in the draft license agreement.  The arrangement allowed ASSEC to take the position that it had no obligation to provide support to Odysseia until the parties signed a license agreement while insisting that Odysseia provide a project site and evidence of investment in the project as a prerequisite to the execution of the license agreement.  The evidence shows that ASSEC understood that Odysseia could not meet its demand for a site and for investors without a signed license agreement.

ASSEC did not hamstring Mirinae in the same way.  Mirinae's Option with ASSEC obligated ASSEC to "fully cooperate" with government officials in South Korea to enable Mirinae to obtain permits for a Space Camp facility in the country and obligated ASSEC to provide to Mirinae all "information and documents" that Mirinae would need to obtain permits and approvals for the "Space Camp Business." (Doc. 88-3, pp. 33–34).  Mirinae did not have to sign a license agreement with ASSEC to get these materials, so Mirinae had the ability to demonstrate to ASSEC that it was able to secure a site for its Space Camp project.

Jurors also may consider evidence that indicates that ASSEC has a pattern of collecting license fees but refusing to authorize licensees to operate Space Camps. The record demonstrates that ASSEC collected more than $6.4 million from foreign corporations interested in pursuing Space Camp® licenses, including $4.2 million

from a Dubai-based corporation, $1.75 million from Odysseia, and $300,000 from a Singapore entity.  None of those potential licensees operated a Space Camp.

ASSEC executed a final license agreement with the Dubai-based Space Investments, but that license expired because the Dubai company did not open a Space Camp in time.  (Doc. 88-1, p. 10, tpp. 35–36).  Space Investments had paid more than $4.2 million to ASSEC as of May 2010.  (Doc. 88-1, p. 15, tp. 53; Doc. 88-2, p. 20).  Ms. Crozier testified that the Dubai group bought "all the Space Camp equipment, all the simulators" and that the last she knew the equipment "was in a warehouse in India."  (Doc. 88-1, p. 63, tpp. 247–48).

A Singapore entity wanted to create a Southeast Asia Space Camp®.  It paid ASSEC $300,000, never received a final license agreement from ASSEC, and never received a refund.  (Doc. 88-1, p. 14, tp. 49).  In fact, the only operational international Space Camp® programs are in Canada and Turkey.  (Doc. 88-1, p. 11, tpp. 37–38).[19]  ASSEC's records show the Canadian Space Camp® contract was entered in January 1992, and the Turkish Space Camp® contract was entered in December 1996.  (Doc. 88-2, p. 22).

---

[19] Minutes from the November 2, 2007 ASSEC Board Meeting show that ASSEC was discussing Space Camp® licenses with parties in China, Mexico, Brazil, Malaysia, and India.  (Doc. 88-4, p. 15).

When Dr. Barnhart assumed control of ASSEC in January 2011, "many previous contracts . . . had expired." (Doc. 88-17, p. 21, tp. 77). ASSEC was struggling with debt of more than $15 million. (Doc. 88-17, p. 23, tp. 85).[20] In a November 2010 news story, General Capps explained that "another arrow in his financial quiver" was the "lucrative business of selling licenses for foreign space camps." (Doc. 88-15, p. 24).[21] A jury reasonably could conclude that ASSEC collected license fees from international companies to generate revenue without intending to stand up Space Camp® programs abroad.[22]

Lastly, ASSEC hired Mr. Song, a South Korean lawyer, to help it negotiate with a Korean licensee, but ASSEC's written agreement with Mr. Song expired when ASSEC received Odysseia's $1.75 million license fee. (Doc. 96-1, p. 7, ¶ 1.3). Jurors could conclude from the terms of Mr. Song's contract that ASSEC had no

---

[20] In her 30(b)(6) deposition, Ms. Crozier testified ASSEC was carrying around $19 million in "old debt" as of 2011. (Doc. 88-1, p. 53, tp. 207).

[21] Ms. Crozier disputed that licensing fees were lucrative to ASSEC. (Doc. 88-1, p. 63, tp. 246). She explained she believed the licensing agreements were lucrative "if they are up and running and we are getting royalty fees from them." (Doc. 88-1, p. 63, tp. 246). But Ms. Crozier conceded ASSEC did not spend "millions of dollars in effort toward" certain licensing agreements. (Doc. 88-1, p. 63, tp. 247). The evidence, viewed in the light most favorable to Odysseia, suggests that at most, ASSEC had minimal overhead to expense against the $1.75 million license fee ASSEC received from Odysseia.

[22] This evidence undermines ASSEC's argument that it is an arm of the State of Alabama. The State has worked hard to develop foreign business investments in Alabama. It is difficult to imagine that the State would allow an agency under its umbrella to accept millions of dollars from foreign investors without either providing a return on the investment or a refund if the investment did not come to fruition.

plans to continue to work with Odysseia after it received its $1.75 million license fee, and those plans existed when ASSEC signed its agreement with Mr. Song on March 1, 2006.  (Doc. 96-1, p. 7).

Odysseia relied on ASSEC's representation that it would execute a license agreement if Odysseia paid a $1.75 million license fee, and Odysseia invested not only $1.75 million for the license fee but also another $800,000 to develop Space Camp South Korea.  (*See* Doc. 56, p. 29; Doc. 96-2, p. 4, ¶ 7; Doc. 32, p. 12, ¶ 25). Thus, Odysseia has evidence of injury and damages.

Accordingly, the Court denies ASSEC's motion for summary judgment on Odysseia's promissory fraud claim.

### Unjust Enrichment and Promissory Estoppel

To prove ASSEC was unjustly enriched, Odysseia must show ASSEC "holds money which, in *equity and good conscience*, belongs to [Odysseia] or holds money which was improperly paid to [ASSEC] because of *mistake or fraud*." *Avis Rent A Car Sys., Inc. v. Heilman*, 876 So. 2d 1111, 1122 (Ala. 2003) (internal quotation marks and citation omitted) (emphasis in *Heilman*).  "The doctrine of unjust enrichment is an old *equitable* remedy permitting the court in equity and good conscience to disallow one to be unjustly enriched at the expense of another." *Heilman*, 876 So. 2d at 1122 (internal quotation marks and citation omitted) (emphasis in *Heilman*).  "The purpose of . . . promissory estoppel is to promote

equity and justice in an individual case by preventing a party from asserting rights under a general technical rule of law when his own conduct renders the assertion of such rights contrary to equity and good conscience." *Mazer v. Jackson Ins. Agency*, 340 So. 2d 770, 772 (Ala. 1976) (citing *First Nat'l Bank of Opp v. Boles*, 165 So. 586, 592 (Ala. 1936)).  Under Alabama law, equitable remedies are not available where parties have an enforceable contract, and the party seeking relief may seek damages for breach of contract. *Aldridge v. DaimlerChrysler Corp.*, 809 So. 2d 785, 794 (Ala. 2001) ("When one seeks to impose liability under the doctrine of promissory estoppel, we look to the facts to determine whether that doctrine can be used to create liability, once we have determined that no binding contract existed.").

If Odysseia is able to prove that it had an enforceable contract with ASSEC, then Odysseia's remedy will lie in contract, not equity.  If Odysseia cannot prove that it had an enforceable contract with ASSEC, then it may pursue its equitable claims because the evidence, viewed in the light most favorable to Odysseia, demonstrates that ASSEC holds money that in equity and good conscience belongs to Odysseia and that ASSEC obtained through mistake or fraud.

Therefore, the Court denies ASSEC's motion for summary judgment on Odysseia's equitable claims.

**Conclusion**

For the reasons discussed above, the Court denies ASSEC's motion for summary judgment.

**DONE** and **ORDERED** this August 26, 2021.

_____
**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE